You guys don't want to just stay there? Oh, you are. This is another case between South Carolina and the United States. And I guess we're going to have the same teams. It's just flipping orders. We didn't beat you up that badly, did we, Mr. Tenney? You're welcome to continue. Okay, we have Mr. Rohrbach beginning on behalf of the government. Thank you, Your Honor. May it please the Court, Andrew Rohrbach for the United States. The injunction in this case requires the United States to spend over a million dollars a day building a project that is 30 years behind schedule and more than $10 billion over budget. Congress expressly permitted the Secretary to stop construction of this project so long as he certified to Congress that a cheaper alternative for disposing of the same plutonium exists. The Secretary did just that. He submitted the necessary certifications to Congress and he issued an order beginning the process of winding down this project. South Carolina lacks standing to challenge that Secretary's decision. Let me ask you, I want you to get in that because I think it's a very serious issue. The question is, if you enter a mandatory injunction that requires the United States to spend money, where is the court going to find the money? Are they going to find, require the Congress to tax the people or to change the budget? In other words, is there some doctrine that says that a district court can't order the federal government to spend money that it's chosen not to spend? I'm not sure the answer to that, Your Honor. I mean, for the fiscal year 2018, the necessary money was appropriated by Congress to continue construction of the MOX facility. If at some point in fiscal year 2019 for which that money was not appropriated, the Department ran out of money. It's the same issue, though, isn't it? I mean, that is an issue of appropriation, but it seems to me that even if it's appropriate and the agency has Congress' approval to wind down, that goes into the calculus as to how the money is spent and who's going to be raising the money. It's a pretty dangerous area for the courts to be involved in. I agree with that, Your Honor. Yes. I think this is a very treacherous area for the court to be involved in, especially because this is clearly an area in which the executive branch and the legislative branch are actively discussing the future of the MOX project. And we've seen that in four separate statutes passed over the last two years, the two authorization bills and the two appropriations bills. And each of those, Congress has spoken to what it sees as the future. Right. That's right, Your Honor. And we think it's not appropriate for the district court in this case to have ordered the Secretary to continue construction of this project, notwithstanding Congress' various enactments on this point. We think Congress was very clear in the fiscal year 2018 authorization bill that the Secretary was free to stop construction of this project as long as he submitted the necessary certifications to Congress. In the 2018 appropriations bill, Congress said, in addition to those certifications, we'd like you to give us the cost estimates on which they are based and give us 30 days before you actually begin the process of winding down the appropriation. And in the 2019 fiscal year appropriations bill, Congress appropriated $25 million for the design phase of the dilute and dispose project and the necessary amount of money in the Secretary's budget request to begin the winding down of the MOX project while the Secretary considers the options for plutonium disposal. And your argument is that South Carolina has no business participating in that discussion. That discussion is between the agency and Congress. Well, South Carolina is free to participate through Congress. Well, that's their members of Congress, of course. Yes, of course. But we don't think that they come into court and ask the court to require the Secretary to continue construction of the MOX project, notwithstanding those various congressional enactments. We think of that as in part a merits argument. But on the standing point, the fact that the MOX project is so delayed and so over budget suggests that it's extremely unlikely that the court's order will actually lead to the removal of plutonium or the processing of the plutonium anytime soon. It's not contested in the context of this case that the MOX project will not begin even processing plutonium in South Carolina and turning the defense plutonium into civilian nuclear fuel until 2048. And that assumes that the current estimates continue to be accurate and that there are no further delays and that Congress continues to appropriate the necessary funds over the next 30 years for continued construction of the MOX project. Was your argument just primarily resting upon the fact that you say there's no imminent injury? Yes, Your Honor. We think there's no imminent injury here and that the district court's order isn't addressing any injury of South Carolina. Do you agree with that proposition? Is there anything else we need to decide on this case? No, Your Honor. We think if you think there's no standing, you can make it. Why is there no imminent injury here, then? Why? Because you think 2046 is not imminent, is it? It is very far away. And even then, it wouldn't begin addressing their South Carolina's injury because at that point, the state would have to – at that point, the facility – I can assure you if you come back to us in 2048, I don't think this panel will be participating in the review then. You'll have to explain it anew all over again. Well, I don't know. As you were discussing the earlier argument, two of you were on the panel in the original and some of the other cases. Time has been going on, you know. That's true, Your Honor. So we think that there's just – there's no imminent injury here to the state of South Carolina. But we also think that the balance of the harms in this case tilts extremely heavily in favor of the United States. As I've described and is not seriously contested here, this injunction is costing the federal government and the federal taxpayer over a million dollars a day. There isn't really any harm being done to South Carolina by a halt in the MOX project while the Secretary determines how to proceed in this case. The only thing that the district court and South Carolina has really pointed to in terms of South Carolina's own harm is the harm of indefinite storage of plutonium and the possibility that the Secretary will not be able to restart construction of the MOX project should the Secretary decide that that's the appropriate course of action. But the record here says nothing to indicate that if the Secretary made such a decision, he would be unable to reinitiate the MOX project. The only record evidence on that point is an affidavit from a union member that says that rehiring the workforce would take an extended period of time. And that's not any kind of impossibility that would preclude resumption of construction. When would you – when do you think you'd have to prepare this so-called supplemental EIS? By the way, this is on the Savannah River? It's near the Savannah River. I'm not sure it's – Pretty close to Georgia? It is, yes, Your Honor. Funny, Georgia has no interest in this either. I thought it was right on the Savannah River. Yeah, I'm not – it might be. I'm not sure exactly where – It's right – It is. It's right there. Part of the reason it was built there. It uses river water, doesn't it? It uses river water. That wouldn't make sense. It's on the border. It's on the border of Georgia. Yes. But the NEPA's right there. Right. EIS goes, what, 50 years? The EIS for storage goes 50 years. So in 50 years, then you could argue for some damage at that point. Yeah, assuming that the Secretary and the Department haven't done any subsequent environmental work. I mean, 2046, as the Court noted, is a long way away, and there's plenty of time for the Department to figure out what to do in terms of the storage of the plutonium. But it's very clear that the Secretary would have to do something if the Secretary continued MOX construction, since there's – by all estimates, the MOX plant will not be built by 2046, by the end of that. How many employees are there at Savannah Riverside? I think that the GAO report says that there are about 11,000 employees. How many are on the MOX project? I'm not sure the answer to that question, Your Honor. The State may know how many are working on the MOX project. But that's not in the record, and so it was not any basis for the District Court's decision in this case. If the Court has no further questions, I'll save the rest of my time for rebuttal. Thank you, Mr. O'Rourke. Mr. Lowell. Thank you, Your Honor. May it please the Court. Randy Lowell on behalf of the State of South Carolina. I think everything in this case can be resolved by the answer to two simple questions. Everything flows from these two questions. And the good news for the State is DOE has conceded the answer to both of these questions in favor of the State. Well, why are you up here? It's all been conceded. Because I just want to highlight these two particular points, Your Honor. The first is, is the May 10th waiver termination letter final agency action? And the answer is yes. In the reply brief at page 11, they say- Let's address the standing first, which is jurisdictional. I mean, that may or may not be so. I'm not sure it is. But it seems to me we're having ongoing dialogue between the agency and Congress about the continuation of this plan. This plan is covered by an environmental impact statement through the long time 50-year EIS. And the plan couldn't be completed until, if everything goes to schedule, until the 2040s. And as you know, construction plans go even further. And it's hard to see where the State has any standing to participate in this discussion. Congress is reviewing it annually. They're going back and forth. If they don't like what the agency does, they can do it or they can demand more. And they are. It's a little troubling. And the injunction mandates the federal government to spend money when it may or may not be the policy of the federal government to do so. So with the court's discretion, I'll start at the back of your question and work forwards if that's all right. So as far as the money issue goes, all of the money that is out there has been appropriated for construction. Yeah, but the states don't tell the federal government how to do it. I mean, if they want to put that in a coffer and move it to a Texas plant, and Congress says that's perfectly fine, that's the way we're going to do it and we appropriated it. These are decisions that are not part of the state's interest. Well, but respectfully, Congress did, when they appropriated this amount, the $300 and whatever it was last year, the $220 million for this year. The $220 million for this year is to end it. No, Your Honor. I thought that was what the letter said. Well, that's what their letter said. I read some letter. You've got a lot of letters. There are a lot of letters flying back and forth. This project has a long history of letter writing. But when you go back and read the actual congressional appropriation, it specifically mandates that this money be used for the construction of the MOX facility subject to the waiver. They continue that waiver to bring it forward. Does it mean the MOX facility at the Savannah River site? Yes, sir. That's specifically defined. Is there a MOX facility in New Mexico? There is no MOX facility. Or in Nevada or somewhere else in the United States? No, Your Honor. The MOX facility is actually specifically defined by statute in 2566, and there's only one. And that's in Savannah River site? Yes, sir. In Aiken County? Yes, sir. Right on the Savannah River? Yes, sir. Right on the Savannah River. With 1,800 employees working on the MOX project. Yes, sir. How many employees are there? 1,800 working on the MOX project, Your Honor. 1,800 employees. So South Carolina got 1,800 jobs in the state. Yes, sir. And the government has appropriated the money. Yes, sir. And the district court says you've got to keep appropriated money. Unless and until... To go back to Dave Meyers' problem, the court's got to tell the federal government how to appropriate money. Well, all the court's doing is enforcing what Congress said in the Appropriations Act. That money is specifically allocated... Except Congress said that the agency could waive by sending in a letter, and each year the Secretary has sent in that letter, parroting the statute, and Congress seems satisfied with it, and they're winding down the plant. If they were to continue the plant, I mean, it's sort of work for work's sake, because it looks like they want to wind down the plant. If they continue the plant, we're talking about another 30, 40, 50 years, maybe. This is one of those projects that really is Congress's domain and the agency's domain, and they're talking to each other statutorily. I don't know why South Carolina... South Carolina is upset because it's going to lose the jobs, but that doesn't give it standing. Well, correct. South Carolina is upset because it's going to lose the jobs, and I acknowledge, as I did at the district court, that the jobs alone is not enough to confer standing on the State of South Carolina. Yeah, everybody agrees on that. Yeah. However, here's where South Carolina... What is the imminent injury? What is the imminent injury that you maintain this year? It's the loss of the procedural right under NEPA, the waiver that Congress... That right, it doesn't come up for another 40 years. In other words, the NEPA covers all activities up to 2046 or 48 or whatever it is. 30 years. 30 years, excuse me. 30 years. Well, NEPA only covers the storage up to 2046. However, but there's NEPA right now. If they terminate the MOX project, which is what they're looking at doing, there is no alternative to remove plutonium from South Carolina before 2046. So the injury today, they terminate MOX without an approved disposition pathway for that plutonium. What if they do nothing? Just stop construction? That's what's right now is in focus. It seems to me it's... Well, I mean, respectfully, I don't know that they actually... Practically, I'm not sure that they can stop spending that money. So you're saying this is tied to the first case? Is that what you're saying? In some respects, there's overlap. So you're making their impossibility argument for them? No, Your Honor, I'm not making their impossibility. I mean, they can build MOX. As a matter of fact, there is some dispute about exactly when that MOX project will come online. DOE has its figures, its theories, and its numbers. If you talk to the contractor, they've got a whole different story. The fundamental question is you can argue all the policies you want, but this is really a dialogue between the agency and Congress, a direct dialogue. And it seems to me that South Carolina, as much as it would like to have this, as you agreed, for economic reasons, this is not something it can dictate through a court injunction to tell the agency what to do with Congress or Congress what it does with the agency. They just don't have standing in that area. I must say the only arguments you've raised are really way out speculations about problems that may happen after they open the plant or supplemental NEPAs that may be necessary. None of that's demonstrated. There's nothing that you've been able to show that gives you an interest in this decision making. I mean, you're sort of manufacturing it. Well, respectfully, Your Honor, I would disagree. That's why you're standing and arguing. The waiver requirement that Congress impose, the very first requirement is a commitment to remove plutonium from South Carolina. But they're moving that, and they've got a NEPA on that already. That was in the other case. They're removing some. But whatever happens in the future, there's tons of possibilities it could happen. But in the present circumstance, they are basically shutting down. The agency wants to shut down, and Congress is going along with it, and we're going to see what happens. But this dialogue is not something that South Carolina has access to except through the senators or the Congress person. You've got a powerful congressional delegation that's already looking out for these jobs. Well, and that's why Congress continues to appropriate the funds and tells ZOE, However. Then you don't need the court. Well, but I mean, I think, you know, Judge Niemeyer, in the last case and here, we all acknowledge this is a complicated issue. You've got a long history, and frankly, you've got a long lead time when you're dealing with something like plutonium. A long lead time to speculate what could happen over the next 30 years when there's no indication that there's any damage to South Carolina. I mean, your only argument can be that somehow the soil is going to be damaged or the river is going to be damaged. But that's all been covered by NEPA at the current status, and if something else is done that requires NEPA, they'll go and do it, just like they're doing on the one-ton removal. They got a NEPA and a NEPA EIS. They did the supplement analysis that comply with NEPA for the one-ton removal. However, the waiver that Congress has put in place before they can stop the project, that waiver requires a commitment to remove all the plutonium that was designated to be processed by MOX. That is way more than the one-ton. That's the 34-ton. No, but they made the commitment. They have made it. But, Your Honor, they asked. They sent it to Congress, and they sent it to Congress, and Congress has accepted it. They sent a second one to Congress. I think they've sent a third one, haven't they? No, Your Honor, I think they've only sent the second one earlier this month. Right. And this is between Congress and the agency. Well, respectfully, we disagree. And the committees. And part of the problem with Well, where does South Carolina get the standing to participate? I mean, the Constitution doesn't seem to do it. Well, first, Congress has said that the state of South Carolina has a compelling interest in the safe and efficient disposition of plutonium at SRS. But that is already addressed. There's no risk that if they decide to stop, there's no risk to that at this point. Nothing's been demonstrated. Well, but the problem is, if they stop HOTS They have an effective NEPA in place for many years to come. They have an effective NEPA in place to store plutonium through 2046. I should say EIS, not a NEPA. A NEPA is the That's Right, that's a shorthand. Yes, Your Honor. They have an EIS in place to cover storage at SRS through 2046. However, if they terminate MOCS, and they do not have an alternative disposition pathway that has been approved by Congress, or that has gone through the NEPA process, then the default position, the status quo, once that happens, is plutonium is in South Carolina forever. Because they have no way to get it out. Who says that? It's there for a while, but who says that? I mean, Congress is addressing this. This debate has been going on for They got that Nevada mountain disposal site, and I don't know if that's dead or they're going to ever put something there. This is a big policy issue involving complex issues involving multiple states. But what you're invoking are the possibilities of what happens and how those policy issues are resolved. But at the present time, to stop construction is Congress's prerogative. And it's exercising that prerogative. Well, but Congress granted the ability to They delegated the authority, essentially, to DOE to be able to check the boxes on the waiver and certification before they shut down the MOCS plant. The first thing was a commitment to the state of South Carolina to remove all of the MOCSable plutonium. But that isn't what's at issue here. The issue is to keep the plant going at a million dollars a day when the Congress and the agency working together decided they don't want to spend a million dollars a day. That's the decision you're challenging. And it seems to me what follows that are other possibilities. But I don't know how you get a right to have a say in that dialogue. Well, our position is that Congress gave us that right. And Congress gave us that right, A, through acknowledging that we have a compelling interest in the disposition of plutonium at SRS. And in the waiver itself, it requires a commitment to the state to remove the plutonium. That's back in the first case. No, Your Honor, this is a And Judge Childs has ordered them to remove it. Well, there's an overlap in a sense because when you look at 2566, setting aside the one-ton removal that was just discussed in the prior case, there is a requirement that all the MOCSable plutonium that is transported to South Carolina has to be removed by 2022. When you also look at the 2566 scheme, That's not at issue. The issue is It's not at issue yet. Well, of course. But that goes the whole standing business. And we just have an abstraction here where South Carolina disagrees with the discussions going on between Congress and the agency. And basically, the agency has decided this is a How many times? Is it 10 times over budget? And it's probably increasing. It depends on who you ask, but it's over budget. Way over. I mean, multiple. Anyway, it's a And the order requires Congress What if Congress says we're not going to do this project at all? So we're spending $10 million a day because the South Carolina court said we don't like it. Congress has the authority to pull the plug. They did. Well, what they did was they imposed certain conditions on the ability of DOE to pull the plug. And let the agency and Congress work that out. That's their business. Well, Your Honor, I don't The state of South Carolina doesn't believe it is. The state of South Carolina has an interest. The only interest you really have is the one you concede that doesn't give you standing is you're interested in having more employment in South Carolina. And I understand that, but that's not That's Congress's decision whether it spends money in South Carolina or Minnesota. Well, the interest of South Carolina is to ensure the plutonium that we do not become what DOE is acknowledging, Congress is acknowledging that we do not become the dumping ground for plutonium. The interest of South Carolina is This injunction doesn't answer that at all. This injunction says keep working on the plant. Well, this injunction requires them to comply with the requirements of the waiver. And that's where we're talking about this policy issue between Congress and DOE and how are we going to deal with the plutonium. I think it just said you can't close, you can't stop working. It mandated them to continue working, right? Well, it mandated them to continue working until they complied with the waiver requirements and the NEPA requirements in the case. There are no NEPA requirements right now. And the letters apparently have satisfied Congress up to now. And so the question is, is the court going to second-guess that?  Well, then Congress will say so and change its mind. Well, in a sense, Congress has. Congress has ordered the Comptroller General. You've got a senior senator there that's got a lot of clout. And he can go in there and he says, we need to double our efforts, spend a lot more money here, hire twice the number of people. And I believe that is, I'm pretty sure that exact discussion has been held, Your Honor. All right. But you also wanted, years ago, you wanted that Spanner Interstate in South Carolina, the nuclear, for what it is. They did. And it caused a lot of jobs. Everybody wanted it. And, I mean, Judge King and Judge Niemeyer, you both sat on the panel that found that the state of South Carolina had standing under NEPA on a plutonium disposition project out there. And, I mean, you may recall, Judge Niemeyer, you've alluded to Senator Graham. He was actually the congressman for this district at that particular time. As I recall, this is remote, but as I recall, there was a ship coming from Europe actually with Russian plutonium headed for South Carolina. And there was an issue of whether America had to receive it and the Department of Defense had designated this pursuant to a treaty or something. I don't remember it all. But I do remember walking into the courthouse, and there was a big cardboard bomb up there painted silver. And as we walked by, Judge Widener or somebody said to me, he says, Good, they don't know who we are. And we walked through this big crowd. But I don't think that's this issue there. I don't think we've got the Russian ship out there. We'd have to look that up. You guys didn't brief it, did you? No, Your Honor, not in this case. But, you know, raising the Russian ship and accepting this plutonium, that's another question that's involved in this, is there's actually an international nonproliferation agreement. I know, I know. And by terminating MOX, the United States is walking away from that nonproliferation agreement. Well, that's not fair. What they're walking away from is the manufacturing plant of oxidizing plutonium in South Carolina at that plant. But they have a problem. Plutonium is all over. We have stored in several sites in the United States. Well, it is. And we're going to address it as a country. It's a policy matter. And Mr. Tenney explained to us that they're now working on this dilution and disposal type of thing, which is probably newer technology. But they are addressing it, and it's treated as a serious issue. The question is whether you can insist on the government pursuing the construction of this one plant. And your argument is if they don't, they're a dereliction of their international treaties. Well, I don't think that follows. Well, what we're trying to enforce is actually trying to find a disposition pathway for the plutonium that's in South Carolina. That's not your problem. This is a government plutonium, and it's a government plant, federal government. It is, and it's in the state of South Carolina. Well, if it affects South Carolina adversely to not build the plant, then you can raise it. But there's no effort of showing that. It's got its NEPA. It's got its plutonium is stored the way it is. It's just the same as it's always been. And they'll figure out something. They're working hard at it. That's what South Carolina is trying to do. What we want is for them to figure out something. I know, but the district court can't tell them to continue working on the plant and spend federal money the way the federal government chose not to do so. Well, but all the district court's doing is enforcing what Congress appropriated the money for in the first place. They can't do that either. The district court can't enforce the law that Congress set forth? The money is allocated to the agency. It's not to South Carolina. That's true. But the money's specifically dedicated to the construction of the facility. Now, Congress gave DOE an out to terminate the facility. You can't tell Congress how to spend its money. And this is pretty fundamental. I mean, we're talking about two different governments. You have an interest in your economics. I understand it, but okay. Well, Your Honor, I see that I'm out of time. Okay. Thank you very much. Thank you. We'll come down to Greek Council. Oh, yes. You're right. We have Mr. Rohrbach back. Thank you, Your Honor. Just one extremely brief point of rebuttal, which is that the State has said several times in their brief and in their argument today that Congress wanted the Secretary to continue construction until there was a fully approved alternative plan, and that's just plainly not what the statute says. The statute calls for the Secretary to identify that a cheaper alternative option exists in order to stop spending the money on construction of the plant, and that is precisely what the Secretary did. It's a complex issue, but certainly whether you agree with the way and whether it's all adequate or not, that's between the Secretary and Congress, it seems to me. Okay. Thank you, Mr. Rohrbach. Thank you, sir. We'll come down to Greek Council again. We're happy to do that. And then we'll take a short recess.
judges: Paul V. Niemeyer, Robert B. King, James A. Wynn Jr.